21-138420442177United States v Smith, Stevens and Quinn. We have Mr. Auerbach, Henson Becker, Henson Becker, excuse me, and Patterson and also McKeon. Good morning. I'm always mispronouncing your name. I'm sorry. I did it again. I did it again. I'm sorry. McKeon. McKeon. Yeah. One of these years, one of these decades, I'll get it right. Mr. Mr. Auerbach. Good morning, Your Honors. Dan Auerbach for Appellant Abid Stevens. I'd like to focus this morning on our issue challenging the jury instruction that the trial court gave on Hobbs Act robbery. It's been clear in the circuit. Are you reserving any time for a buck? No, you're not. Okay. It's been clear in the circuit, and we're doing an even division of time, so I thought with the shorter time. So it's been clear in the circuit since 1948 that the common law elements of robbery are a requirement to find someone guilty of Hobbs Act robbery. The trial court did not charge the jury that it had to find that the Hobbs Act robbery required a permanent deprivation of the victim's property. And in this case, it's been settled, as I said, since 1948, and there's recent decisions as recently as 2021 reiterating that. So it was clearly. So we have not in making references to Nedley, the case that you're saying, settle this for our circuit. Those were not specifically addressing the question of an intent to permanently deprive. And I question to you is, why shouldn't we agree with the 11th Circuit's observation that Nedley has been abrogated by intervening? And also, although it's not cited by the parties, and I apologize for not raising, citing it to you all sooner, but also United States versus Carter, which is at 520 U.S. 255, a 2000 Supreme Court decision, that was not cited by the parties. It was looking at bank robbery under 18 U.S.C. 2113. And in comparing subsection A and subsection B, looks to subsection A, which has very similar language to Hobbs Act robbery, and observes that it says takes, not takes and carries away. And with takes alone concludes that that deletes the element of intent to permanently deprive. I'm not familiar with the Carter case, so I can't address it on the merits of that. I'd be happy to file a post hearing submission very brief on that issue, since I'm not familiar with it. But for several reasons, so the first one is the Hobbs Act explicitly uses the word robbery in its text. So part of this court's analysis in Nedley was because it uses the word robbery, that implied that the common law elements were required, specifically given the legislative history at issue with the Hobbs Act. So I'm not familiar again with Carter. I don't know if the same legislative history exists, and I don't know if the word robbery is used in that decision. But those two facts were critical. The other thing I would suggest, Your Honor, is I don't think this court determines that its own rulings were overruled by implication of a Supreme Court case in a different context. So I... So robbery appears in the statute, but it's also defined. And where we have a defined term, don't we need to just look at the definition? And of course we would look at the definition, but I think what this court held in Nedley was that because you had the use of the word robbery in the statute and the history from Congress, the legislative history that they were relying on the New York statute, which had been so interpreted, they relied simply on the word robbery in it to find that the common law elements applied. And I would also... I'm sorry. Do you think legislative history carries the same weight today it did in 1958? I don't think it does, but I think it's textual as well. So I think the Nedley panel was textual. And the other thing is that this court has relied on Nedley recently within the last several years in saying that Hobbs Act robbery is a crime of violence. And it relies specifically on the finding that it is a common law. You're talking about Walker? Yes, Your Honor. So in Walker, this court specifically relied on this principle in order to say that Hobbs Act robbery is indeed a crime of violence. So we would be upsetting prior press. And I understand Walker was the Supreme Court granted cert in Walker, and it's no longer good law. But I think that this court has continued to rely on Nedley despite those issues. Let's just assume you're right. This argument was not made at trial. So we're in plain error. Yes, Your Honor. Was there an error? Was it plain? And did it prejudice your client? Where's the prejudice? So our entire defense here was this issue. Our trial counsel unfortunately didn't make it through these terms. But the entire defense in this trial was that my client wasn't an active participant in this robbery, didn't intend that it occurred, and there's substantial evidence of record to support that. So the error must have affected the outcome of the district court proceedings. I think the standard is somewhat lower than that. I understand that's the framing of it. But in Dobson, I don't think that's exactly the analysis. Mr. Greer said a reasonable probability. Okay. So we're in Strickland territory. We're not in Chapman harmless beyond a reasonable doubt territory. I'm not sure I would use that exact phrasing, but conceptually I agree. I think this court's latest and clearest pronouncement on these issues is Dobson. I think this is to us essentially a rerun of Dobson. What happened in Dobson was that there were two different essentially theories under which the defendant could have been convicted. One of them wouldn't have required the intent that was necessary to violate the wire fraud statute. And so because it was conceivable that the jury could have convicted the defendant in that case. Conceivable is not enough. It didn't use the word conceivable. Conceivable, it was a bad word choice. I agree, Your Honor. But they saw there were different versions of the evidence, and it was a real issue where the defendant could have been convicted, even if they weren't actually guilty under the statute. And I think here we have testimony from the government's witnesses that my client specifically said, I want to get you the property back. Okay, we'll have a video. And you parsed that video well. But one of the striking things about the video, which I just rewatched, is after Mr. Stevens walks in, he comes in and he takes his gun and he points it at the clerk. Now, later, he pushes aside some other guns, et cetera, after the clerk has been disarmed. But it's pretty hard to say someone who walks in and points the gun at the clerk is really there to break up the fight. Well, so I don't think we have to prove that he was only there to break up the fight. The question, if we're correct on the law, is whether he intended to permanently deprive the store of its property. So just taking a gun away from someone during an armed altercation doesn't mean you want the gun. Quinn takes $100. Smith brandishes a gun. Stevens leaves at one point and comes in right after that. So he comes back in. Well, so I think what you see in the video is there's a commotion because at that point the clerk had got his gun out. Maurice, Donnie Smith had his gun. There's obviously a commotion in the story. He comes back in. There's no audio, unfortunately, in this video. But I think what you see is that there's a commotion and that's why he reenters the store. But regardless, none of these factual issues, we're not here to fight over this. This is what the jury would be doing with the proper instruction. How about the second problem, plainness? It's not in the model jury instruction. Now, true, we've said our model jury instructions are not wholly writ. The judges don't draft them. But plainness goes to the obviousness of the error. And I think most district judges would be pretty surprised to be told they were making an error by following the model jury instructions. Statistically, usually you're okay. Now, if someone objects, you're supposed to delve in deeper, not just rely on them. But if someone doesn't object, how can we say it's plain when the last time that we relied on this part of Nedley was in 1970 in Carmona, more than half a century ago? So I think this court's analysis in Dobbs supports our position. That involved a 1975 or 6 decision, I forget the name of it, that had been similarly reiterated but in more recent decisions. So I think the state of the law is very similar to what the state of the law was in Dobson. And in practice, Your Honor, I mean, I think if you look up the elements of Hobbs Act robbery, you're going to find these principles quickly. If you just keysight the statute, you're going to find Walker saying it's a common law element. It's literally the most recent discussion of the statute, I believe, in a reported decision from this court. And it's certainly something I found quickly. I know that's not evidence of anything. But doesn't Stevens even have another big hill to climb? Even if we were to find that there was plain error, and even if we were to find that there was prejudice, can't we just uphold his conviction based on Pinkerton liability given that Quinn's actions can be attributed to Stevens? So, Your Honor, so I think the key point on Pinkerton liability is that in order for him to be liable, the definition of what a Hobbs Act robbery matters because he has to have an agreement to commit that offense. So this instruction is something the jury had to rely on in order to find Pinkerton liability because he has to agree to do it. If he doesn't want to do it, he's not a conspirator. No, no, no. I think, isn't it, he's liable regardless of his specific intent? Well, in order for that to be true, you need to be a conspirator in the first place. So in order to be a conspirator in the first place. And the jury could look at this film and make a pretty reasonable determination that the three of them were in cahoots, that is, that they were conspirators. But being in cahoots doesn't make you a conspirator for purposes of Pinkerton. You have to actually want to commit the offense. You have to agree to commit the offense. If you say, I don't want you to rob this store, you can't. What do you think they were agreeing to outside? I don't know what the evidence, I don't think there's any evidence of what happened outside. And I don't, I don't. But OK, so then once Steven saw what was happening, what was coming down, he left. Why did he come back in? Your Honor, from my view of the video, because there's a commotion going on in the store when the gun is pulled and the store clerk has his gun out and we don't have audio. But regardless, what I'm focused on here, Your Honor, is that if I agree with you to help disarm someone in a fight and then you go on later to do something else, that doesn't make me a conspirator or whatever else you're going to do after that. So you have to agree to commit a federal offense. Don't we have also Stevens lamenting that it was only for $100? I don't read that he was lamenting it. He says all this over $100. I mean, maybe I'm reading into this with what I know outside the record, but I don't think that's a statement that lamenting it. And I think a jury could say, why are you people doing this over that, over, over, over $100? Or you could add to that, when Stevens looked up and saw that there was a video and essentially goes, Your Honor, again, I think we're doing what a jury would be doing with this case. Because, you know, you look at that and I don't see it that way. I think he's frustrated with the entire situation. Why did I have to do it? The point is, you're asking us to overturn the jury verdict because there was not a particular type of instruction given. And what I'm saying to you is, even if, one, you've got three issues. Should that instruction, is it really necessary? Two, even if it was necessary, was there prejudice? And three, even if it was necessary and there was prejudice, was there Pinkerton liability? It's a really difficult case you have. Your Honor, so the first thing I want to say is, I don't think we're asking this Court to overturn a jury. The jury is supposed to be apprised of all the material facts. And the Third Circuit has held that what we're talking about is the very gravity of robbery. The government agrees with us about that. The jury was never told that. So under the due process case law, starting with Winship, you know, Apprendio, they're supposed to know all of these facts about what the law is. Well, that's the position we took in Nassar. But in Greer, the Supreme Court decided differently, right? Well, I don't think I'm talking about that specific. Well, I mean, you're indicating that these are things that needed for a matter of constitutional due process, needed to be found by the jury. But in applying plain error and looking at the fourth prong of that, whether it affected substantial rights, the Court said if there's enough in the record, you know, to conclude that it didn't, that the Court can make that determination, even if the government wasn't put to that burden. Right. I agree completely that's the law. I'm not saying that just because it wasn't given that that's all you do. Of course we apply the plain error test that we have to apply here. I was just responding specifically to the fact that we're not asking this Court to overturn a jury verdict with this argument. That's not what we're asking for. This didn't go to the jury. And the discussion we've had here about all of the facts of this case, it feels, again, very much like we're doing what a jury should have been doing in this case, is discussing those issues and figuring them out. Because the burden is not that we have to prove that we're right or that, you know, we would have won the case if we had gotten the correct instruction. We just have to show that the jury could have found our client guilty, even if it did not believe that he was guilty of this offense and did not have the requisite intent to do that. And so the only point of this evidence is to show that there is evidence that the jury could rely on in order to make those conclusions. And if we say, well, I don't see the evidence that way, that's not the standard of review, I don't believe, for this court. Just as in Dobson, the court didn't say, oh, which theory is more plausible? The court just said, okay, the jury could have looked at this evidence and made this conclusion. Therefore, there's an effect on substantial rights, and therefore this is something that paints the reputation and integrity of the judiciary. So I think the analysis is the same even if there are factual disagreements. And, Judge Amber, I think I've explained our argument on the conspiracy issue. I think you need to make that finding of an agreement to commit the actual offense, and the jury is supposed to know what the offense is before it can find an agreement to commit it. And you're sure you don't want any time on rebuttal? Well, if there's time available, I'll take a minute. Well, I'm not sure there's going to be time available, but we could give you a little bit because you probably need to respond to what Ms. McKeon is going to say. I would very much appreciate the extra time. I appreciate it, Your Honor. We'll give you three minutes on rebuttal. Thank you. Thank you. Mr. Hetzenecker. Good morning. If it may please the Court, my name is Paul Hetzenecker, and I represent Maurice Quinn in this appeal. I really want to argue two issues. The first is the insufficiency of the evidence for the aiding and abetting on the 924C count. As Rosamond has dictated and made very clear, that in order to establish that there was aiding and abetting with respect to the 924C, there has to be advanced knowledge. That is, knowledge beforehand. And in this case, the facts are pretty clear. And I'm going to recite the facts as carefully as I can with respect to Mr. Quinn. What was improper about the 924C instruction? My client has not the instruction, the evidence. I'm challenging the sufficiency of the evidence. That there was no evidence that my client engaged or had advanced knowledge prior to both Mr. Stevens and Mr. Smith introducing the guns. My client has some sort of scam involving the counterfeit $100. He goes and starts an argument with the clerk. The clerk then introduces the weapon. And that becomes a critical point because it involves all three. Stevens and Smith have no interest in the $100, none at all. Their interest obviously is heightened by the fact that the clerk, Mr. Ventura, pulls the weapon and comes around, backs my client out from behind the counter, comes around with the weapon in his hand. That's what escalates this from the very beginning. Your client takes advantage of the guns, et cetera, to go around and take the $100. And force the person to get a register. But prior to that, Judge, what he does do is he leaves and comes back. But when he leaves, Stevens comes back with respect to, and has a gun obviously, within four seconds. So there was no way my client would have had advanced knowledge that this was going to be an armed robbery at that point. The jury can't infer by this close coordination in time that they're working together? It's insufficient as a matter of law for a jury to convict based on that? Yes, because they could infer that, in fact, my client, when he pushes Stevens' hand away, when he puts the gun to the clerk's face, he pushes Stevens' hand away, turns his back to the clerk that he's trying to thwart that. At the point at which, as Roseman dictates, in a drug transaction, at the point at which the transaction now is clearly in the mind of the appellant, that it is an armed drug transaction, in this case, an armed abduct robbery, that he takes action. And the action he takes, and I'm arguing that the withdrawal at this point, is when he turns and pushes Stevens' way, as if he's saying, I can handle it, we don't need the gun, and he does the same thing to Smith. So this, in real time, if we look carefully at this video, this is the reality of essentially a conflict. One possible reading of the video. Why could no reasonable jury read it differently? I think under the circumstances, if you look at the instruction that Roseman provides, which is that in the context, in the heat of that particular event, in the case of Roseman, it's a possession with intent to deliver a drug transaction, which the appellant becomes aware of the armed impact of that. At that moment, he's got a choice. But what's clear is the choice is not to simply walk out. There are a number of choices. My client makes that choice and thwarts the arm with the gun in the face of Ventura, forces the arm back. And at that point, he's essentially done exactly what he could do to withdraw. Quinn comes back and forces the clerk to hand over $100 cash under duress. He does. He does. He does. But it's only after he thwarts the other two. He thwarts the other two. How does he do that? He pushes Stevens away with the gun and he pushes Smith away with the gun separately. He does it on two occasions with each individual. That's a 924C issue, right? That's exactly what I'm arguing, that it was not foreseeable to him that this was going to be an armed robbery. Now I segue to the first question I asked. What was improper about the 924C instruction? I mean, the question is the instruction talked about leave the robbery. Did it not? And you wanted a different type of instruction than that? No, no, no. I'm not saying that. I'm not challenging the instruction. I'm saying that the evidence is sufficient. That's my argument. It's insufficient to establish it because it was unforeseen. And at the moment that my client acted or the moment my client could withdraw under Roseman, he did so by the actions he took in thwarting the guns. How is it withdrawing when he forces the clerk to take the money from the register? He doesn't need the advance knowledge doesn't need to be before they walk in the door and begin the robbery. When it becomes clear to him that it is an armed robbery, then the question is, did he walk away when he reasonably could have? He did not. And he did not. He did not. But my argument is that at the point at which he would have the option of walking away, he could walk away and then be essentially defeated in the eyes of the other two and they escalate the violence. Because that's what Roseman keys on. The keys on is can you walk away at the moment and the violence de-escalates or we avoid the violence. If he walks away and Smith and Stevens believe he's now been defeated by Ventura's introduction of the gun, he couldn't get his money back, it could escalate the violence because Steven and Smith could act on their own and shoot Ventura at that point. Separately, independently and spontaneously separate from my client's advance knowledge. So I'm not saying that's the only thing he could do. I'm saying that under the circumstances, what Roseman says is that the instruction allows for the withdrawal. My argument is that was the withdrawal. And the taking of the money was actually a de-escalation. Just like the drug transaction in Roseman was completed. But it's a great argument to make to the jury and to paint it as you have. But isn't the question for us whether the evidence that's in there would be sufficient for a reasonable jury to reach a different conclusion? It is. And my argument is that under these facts, that is there for the jury to reach a different conclusion. It was there. And my argument is that the evidence is insufficient. And that's essentially the argument on the 924C. I do have an argument on the Pinkerton instruction and the appropriateness of the Pinkerton instruction. As this court well knows, and as I cite in my brief, as the government makes very clear in the cases they cite, that obviously it's appropriate to give a Pinkerton instruction even when it's not charged. That the theory of liability under Pinkerton is an alternative theory to aiding and abetting. Absolutely true. But conspiracy is also a criminal charge. And in this particular case, there's no evidence of conspiracy. So I would want to recast the facts for a moment. Just in light of the actual timing of the event. So when my client gets backed away out from behind the counter with Ventura's Glock 9mm in his hand, my client continues to argue for about a minute and then he leaves. Well, when Stevens leaves after arguing with Ventura, my client comes back. It's only four seconds later. So there's no chance to create a conspiracy outside in those four seconds. So to infer that he's waiting out there back up as muscle. The fact that it's so close in time allows the jury to infer coordinated action. We don't require evidence of a written agreement, an oral agreement, a tacit agreement suffice. Correct. Except in this case, the facts are a little different. Stevens remains in there after my client leaves. He remains in there. When he leaves, it's only four seconds later that my client comes back. So I think it's at 1655.13 that my client comes back. Or Stevens leaves and my client comes back at 17. Four seconds later. So there's no opportunity to create a conspiracy under the circumstances. And obviously the condition proceeding to an instruction. The jury could infer that a conspiracy was put into play before they ever entered the store. I mean, it was like it was choreographed. I know. I think that with all due respect, that's not what the evidence shows. And the question is, does the fake $20 bill pass muster? The clerk thinks it doesn't. Gwen gets into an argument. He goes out and boom, they then come back in. As if, as we just noted, perhaps that was the muscle that was outside. But that was the prosecution's theory. But that's not the evidence. The evidence is actually that the argument goes on for several minutes between my client and the clerk. Stevens is in there. He could care less. He doesn't care until the gun is introduced by the clerk. But in effect, what you're saying to us, you're wanting us to substitute our judgment for that of a jury. And that's out of bounds for us. Well, Your Honor, what I'm asking actually in this particular case is to find that the instruction on Pinkerton was inappropriate because there was insufficient evidence of a conspiracy as a condition proceeding. They could certainly present two separate theories. That's clear. On Lopez, it's clear with all the cases cited by the government. I'm not arguing that. What I'm arguing is that under these facts, there was insufficient evidence of a conspiracy, that the actual introduction of the guns was response to Ventura's introducing his own gun. It wasn't to obtain the $100. It was actually in response to Ventura taking the Glock 9mm and displaying it in the open area of the store. And that's what Stevens took offense to. And that's why Smith came back in with the gun. They were angry at Ventura about that. They were not trying to get the $100 from my client. And that was the argument you made in the closing, right? I did not make it. I was not a trial counsel at the time. But that should have been, in effect, a closing argument, right? That was a closing argument. But the instruction, again, is not supported by the evidence. That's my argument. So look at the evidence and say, hey, what really happened here was not a conspiracy, was not an agreement or concerted action. It was not foreseeable, which is required, as Your Honor knows, under the conspiracy charge. It's an agreement, a criminal agreement, that the acts of the co-defendant are foreseeable. And so in this case, there was nothing foreseeable in my client's mind that the two of them would come in, take offense to Ventura introducing the gun and responding kind. They have no interest in the $100. None. There's no conspiracy to take that $100. They're responding to Ventura introducing the Glock 9mm. Essentially, the argument of Quinn is I didn't have the gun. One guy, Stevens, takes the gun. Smith has a gun. It wasn't made. Didn't know anything about it. That argument was made to the jury and they didn't buy it. Absolutely, except the one difference here on this argument with respect to the conspiracy is that should never have been offered. The conspiracy charge was not supported by the evidence. And it could have been provided if there was evidence in all the cases the government cites. You know, as well as I do, the sufficiency of the evidence argument is rarely ever successful. Absolutely. Agreed. So. But in this case, all I'm saying is in this case, I think the lack of evidence on the record does not support the charge. And that's my position, Your Honor. Thank you very much. Thanks very much. Thank you. We'll hear from Mr. Patterson. Good morning, Your Honors. May it please the Court, my name is Attorney Robert Patterson. And I was trial counsel and I represented Donnie Smith then. I represented Donnie Smith in this appeal. Very interesting fact pattern, as Your Honors already saw the video. So the focus of my argument is the sufficiency, because essentially my client was charged and convicted of two Hobbs Act robberies. One was a conspiracy or an aiding and abetting with the $100 that Quinn took. And my client taking of the gun after the incident occurred. So, again, to join in with prior counsel, my client would be considered a principal on taking the gun and a conspirator, aider, or abetter on the $100. I would point to the Court's consideration that, and this is in my brief and also in the briefs of other counsel, that all three of these gentlemen were well-known in this store. All gentlemen knew that there were video cameras throughout the store. That may explain why the clerk was so calm. The clerk was calm. And if you may recall in my brief, the store owner who was called and said, I never said if this was a robbery, I would never go into the store if I knew it was an armed robbery. The evidence showed that while she was en route, that she was watching on her cell phone what was transpiring. She got to the store first before the police ever came, because she knew Quinn. She goes, put Quinn on the phone. I want to know what this is all about. With respect to the sufficiency argument, I'm going to address the $100 first. Again, Quinn goes into the store, whether it was a concocted scheme or not, whether he actually did get fake $100 bills, or $20 bills rather. He has a verbal confrontation with the store clerk. And this was before Smith and Stevens were even in the store. And what happens? The verbal confrontation is escalated by the clerk who pulls the loaded gun. Now, that gun was tested for functionality and had a pin, and it was loaded. So Quinn leaves. But you can understand why a clerk in that kind of situation would have a loaded gun. Oh, I understand, Your Honor. But Quinn was not armed at the time. And as prior counsel just stated, I remember in my closing, I had a, I don't use video, I had a big poster board of the time. We're talking seconds that they were in and out of the store. And I also note for the court's consideration for sufficiency is one, they were known in the store. Two, there was cameras. They knew they were in the store. They knew the store owner. And during the entire time that this violent Hobbs Act robbery was occurring, the store owner had access to a cell phone. I asked many questions of the witnesses during the trial, were they allowed to come and go in and out of the store? And they did. While this was going on, they were going out of the store and coming back into the store. So you tried it at trial. It failed. What's legally wrong with the juries disagreeing with your story? The question is whether a reasonable juror would find, given the unusual and strange facts of this robbery, this violent robbery, whether a reasonable juror would find otherwise. Jurors were all unreasonable. Why? Because of the facts. Let's, I just want to focus on the conspiracy with respect to Mr. Quinn. As prior counsel stated, Mr. Quinn had this scheme, or maybe not, to get the $100. And once the gun is pulled, he goes in and he gets Stephen. Guess what? The store owner that we go into all the time just pulled a gun on me. Stephen goes in. Seconds later, Mr. Smith goes in. Now, they're trying to form a conspiracy out of this. And as I believe in the brief of the government, they said that they conspired outside. There were cameras outside that the witnesses, the police admitted to having the footage, but they never reviewed and they never submitted on at the trial. There were cameras pointed right at the door. So if there's any conspiracy going on because they're saying they kept coming in and out of the door, this was seconds that they were doing this. There was testimony, but they didn't show it. What were they doing? I understand a conspiracy can happen in an instance. But there is no testimony of a conspiracy. Again, I would, what prior counsel said, that they were angry that the store owner and the store that we go to all the time, and Quinn's at that Mac machine almost every day. How dare he pull a gun? So, as in my brief, Smith, Donnie Smith's only involvement in this was to disarm the clerk. I got a justification instruction because of defense of others, because there was seconds that my client's wife was in the store and they all knew who was her wife because they testified to that. She was in the store with the armed store worker, clerk rather, and then he comes in. He ushers her out, and that's in my brief, and then he disarms the clerk. Once he disarms the clerk, and it's very clear in the video, Smith and Stevens, now my guy has two guns in his pockets, I can't get around that. They just stand there while Quinn takes the $100. They don't say take anything else. I was very specific cross-examining the store clerk. You were doing business an entire day that day. You must have had hundreds of dollars. He goes, yes, we had a lot of money. Did Smith take anything? Nothing. He took nothing. He stood there. Quinn got the $100 and left, and what did Smith and Stevens do? They waited for the store owner to come, and again, the store owner comes in without the police, and Stevens is trying to say, what's going on here? All of this happened over $100? They didn't even know what Quinn was doing. They just were like, he pulled a gun on you? Well, then we're going to do what friends do. Again, this is a different society. All the facts look pretty bad. Wasn't Smith the driver of the car that crashed? He was, and I did not brief that. The flight, I didn't argue flight. He did because he was a felon not to possess, and that's why he left. I didn't even approach that subject on my brief. It wasn't the gun found in the car? It was. It was. So in my brief, we're permanently deprived the owner of his property, and again, he would have to be the principal, not an aider or a bedder for the theft of the gun. He did that because he took the gun to disarm the clerk who escalated a verbal confrontation into an armed confrontation with his wife who was in the store for a period of time. So he couldn't leave when he heard the sirens because he was a person not to possess. I thought he came in, told his wife to leave, she leaves, and then he pulls the gun. Isn't that right? He does, but before he comes in, there was in my chart, there was around three or five seconds that she was in the store alone before he came in. And that's why the trial judge gave me the justification in defense of others because of the fact that my client's wife was in the store for a brief period of time. So logic would dictate, and this is in my brief, that he could not give the gun back to the store owner or the clerk and then leave because he has a gun. And the police are going to arrest him for felons not to possess, but he takes the gun with him. So that kind of coincides with the jury's instruction for the, they have to read to the instruction to permanently deprive the owner of his property. That wasn't his intent. His intent was to disarm the store clerk and assist his wife leaving the store and then that was it. And so, again, with the $100, he had no, he wasn't a conspirator, he wasn't any better, and I would just, again, join in with co-counsel's argument on that issue. Any further questions? Thank you. Thank you. Ms. McKeon. Good morning, Your Honors. May it please the court, Bernadette McKeon for the government. And, of course, I will start with the Nedley issue, the Nedley jury instruction issue. And as we argued in our brief, our position is that the failure to give an instruction on the specific intent to steal and permanently keep the property was not error at all and in any event clearly was not plain error. We have to start with, our brief also, we took the position that Nedley is binding precedent because it hasn't been overruled, so we treat it as such in our argument. It also seems to have been ratified a few years later in a case called Carmona. In the Virgin Island Carmona case, yes, it was. They relied on Nedley to find that the Virgin Island statute, robbery statute, implicitly included the elements of common law elements of robbery. However, the difference there was there was a request to give that instruction and the judge had refused to do so and it was a harmless error case. And after Carmona, there was no reason to revisit that because it was just routinely given. That charge was routinely given. Later on in Hodge, which applied Carmona but also on whether the indictment was sufficiency, they recognized that that may have been. The court drops a footnote and says we may have been wrong on that, but we can't override the precedent in this decision. Same thing here. We are dealing with Nedley. Our position is, and it's important to go back and put Nedley in context. Nedley comes up right after the Hodge Act robbery statute is passed. It's the first case to deal and grapple with what does robbery mean. Worst facts possible for the government, they basically were arguing that a mere interference with property to prevent it from moving forward in interstate commerce was robbery or attempted robbery. The district court judge in evaluating the Rule 29 motion in that case, he said, well, I don't read the statute that way. I don't think the common law elements are included in the statutory language, which was modeled on the New York Code, and therefore, you don't need to take property. There's no taking requirement or aspiration requirement at all. Of course, the Third Circuit was in the position of evaluating the judge's comments, looks to the legislative history. But the important part about Nedley is what the court was doing was interpreting the statutory definition. And it concluded that it was implied that the common law elements were implicitly included in the statutory definition. Well, Carmona seems to have gone a step further, however. Well, Carmona actually repeated that, that Nedley did implicitly include that. But it required a quote, required a specific intent to deprive permanently a rightful owner of his property. That's correct. And under Nedley, the evidence still has to prove that element. The question is, did Nedley establish that a jury must be instructed on that requirement? And our position is, is that the instruction that was given in this case, the model instruction that was adopted more than 45 years after Nedley and did not incorporate the specific intent to steal language, that it implicitly requires the jury to find that the defendant had the intent to steal and take the property. In other words, a forceful taking of property of another person against their will, in almost every case is going to include or encompass a specific intent to steal that property, not to borrow it, not to take it temporarily and then return it. If that were the case, that's not robbery. Now, go back to Nedley again, where the court talked about robbery every day. They were citing the legislative history, but everybody knows what robbery means. Representative Hobbs had said, you know, it's been addressed by the courts thousands of times. Everybody knows what robbery means. Robbery means stealing property. It doesn't mean borrowing property. Or I'm going to forcibly take it from you, but I'm really going to give it back in just a few minutes. Fast forward to 2021, doesn't Walker suggest that specific intent is an element of Hobbs Act robbery? Walker just generally observed that Hobbs Act robbery, and they cited Nedley, is common law robbery that affects interstate commerce. The courts made that observation a couple of times over the years. Now, of course, the more recent line of cases, starting with Johnson, has always focused on the use of force and whether that is going to constitute a crime of violence. And that was the issue in Walker, of course. I mean, then there's the unpublished, but hopefully will be published, Cope's decision, which also goes back and addresses Hobbs Act robbery. So the courts repeated that. And we're not contesting that it doesn't implicitly include the common law elements of robbery. That, in other words, that if you commit a robbery, you have to have the intent to steal that property. To be clear, although the 11th Circuit has observed that intervening Supreme Court case law, in their view, cast doubt on Nedley, and there's certainly language that would suggest that in both Culpert and Carter. The government waives the argument and would not have us revisit. I agree with your analysis. I mean, especially Culpert. I mean, they were considering whether racketeering was an implied element of the extortion offense. And the language in Culpert says the definitions are precise and clear. And, of course, Congress knew when they adopted those statutory definitions, that's it. It does call into question whether or not you then graft onto that common law elements that are not specifically stated in the statute. And they emphasize it's to be given the broadest possible interpretation, the statutory language. It's supposed to reach any conduct within statute that falls within the statute. That's focusing more on the interstate commerce, the breadth of the reach of the statute. I don't know. There are a line of cases definitely that focus. It comes up most often in that. But that wasn't what Culpert was saying. Culpert was looking at the definition of extortion, not robbery. Is the government familiar with Carter? I am, Your Honor. And I actually looked at whether we should have presented an argument about the analogy with bank robbery. Because, of course, I'm well aware that bank robbery does not require any specific intent to steal a property. And that was decided a long time ago. And then, of course, bank larceny, subsection B, you have to have an intent to permanently steal a property. So obviously Congress knows when it wants to include an element to include an element. And they did look, and both statutes were passed in 1948. So they were adopted at the same time. And one could call from Carter that that means that Congress knows how to define a crime. And they know how to define a term like robbery. We just felt that we were, to lack of a better word, stuck with Nedley for now, unless Your Honors want to take on the issue and reconsider it at court as a whole. I don't think it's really necessary. We, as a panel, generally don't do that, unless there's been intervening Supreme Court precedent that abrogates our precedent, and that's clear. But I take it from the government's argument that the government does not believe it's clear and has waived that argument to us today. We did not present that argument in our brief. We noted that we had the criticism and that there's at least a suggestion that it can be overruled, revisited based on Supreme Court precedent. I would feel uncomfortable saying whether we should be pushing that position right now because I have to. We can give you a week or so, both sides. That would be very helpful because it would clarify things. I mean, because now, if I can get to the plain error part, because we're saying it's not error at all. Let's say it's error. Let's say we think Nedley best read means this and that it hasn't been abrogated by Carter or anything. What's the relevance of the model jury instructions? I mean, we've said they're not binding law, but it can be an error. Sometimes model juries, they're not written by judges, et cetera. Does it bear on the plainness of the error? It does, Your Honor. And we do. We recognize that a model jury instruction, they were not specifically adopted, approved by this court. Yet, they are strong evidence that this is how this element has been treated in this court. Since, well, the model instruction was adopted sometime after 2004. That's when the process began on Hobbs Act robbery. But to back up, in years, since 1958, there's 45 years before they even begin this process. There is not a single decision by this court or any other court finding that the failure to give a specific intent to steal and permanently keep instruction was error. So despite Nedley, and there's absolutely no indication. I did an exhaustive search. There's no reported decision that even suggests that it was an issue, that it ever came up. Now, there could have been a case where somebody requested the instruction. There was no objection. And it was given. And that's the end of the story. But it was not routinely given prior to the standard instruction. Then the standard instructions, the model instruction is adopted. It knows about Nedley. We're assuming the drafters are well aware of the body of law in Hobbs Act robbery. And they don't include the common law element. And we believe that they didn't do so because it's just not necessary. If it's an element of the offense, including it as part of the jury instruction is not necessary? We think that the statutory language, the statutory definition of robbery, effectively encompasses a specific intent to steal. Because after all, that's what Nedley was looking at. We're looking at the statutory definition. Does it implicitly include these elements? Well, implicitly or otherwise, if it's an element of the offense, if it's the government's position that it's an element of the offense, then doesn't the jury need to be instructed on each element of the offense? Well, of course, Your Honor. I mean, in the sense that a jury is always required to be instructed on an element of the offense. Our position here is that giving the model instruction, which tracks the statutory definition of robbery, sufficiently and adequately conveys that there must be an intent to steal and keep the property. And that is what Nedley found. That it did incorporate or it implicitly assumed that those elements were part of the offense. So to make it plainer, there's not a single, not only is there no case, but that instruction is given in every Hobjack robbery case, at least as far as our office knows. I mean, the rare case where somebody we asked to supplement it, that goes through Mr. Zausmer. So we would be aware of that. It wouldn't be the first time we've said that the model jury instructions had error. Well, it would be, you would effectively be finding that every instruction given in a Hobjack robbery case in this circuit in many, many years was defective. And that just can't be the law. I mean, it can't be the case that for all these years there's been an error in a jury instruction and it's never come up. And that's where plain error comes in. There was no guidance for this court to conclude, huh, I'd better charge on that element of the offense. What it seems like you're arguing is that you would say that you're clarifying, correct? Yes, Your Honor, yes. But where do you, what makes you think that it's implicit in the current instruction? Well, it goes back to Nedley, because Nedley was interpreting, was looking at the statutory definition and saying, what does this mean? Well, look to the legislative history, but what does this mean? And then there's a lot of statements about this is just so elementary. This is centuries of law on robbery that we're not going to just throw out the window. We're going to say that it's included in this statutory definition. So we believe it's adequate. It's certainly adequate as demonstrated by the case law in almost every case. This is the first case I know of that we've gotten to this point and had the issue actually contested on appeal. And so for that reason, even if there's error, it just can't be plain error. In the absence of any sort of plain and obvious and clear ruling, other than a 1958 decision that was really deciding. And again, I go back to the actual context of Nedley. It's so odd, because they're trying to turn what's basically kind of an extortion into a robbery. So that's prong two. Let's talk about prong three. I think, you know, we have, Mr. Auerbach makes an argument, you know, that his client said, I'm going to go get the gun back for you. I'm going to get the money back for you. Maybe that raises a reasonable doubt. How is the reasonable probability standard, how different is that from the Chapman standard? How should we understand that in terms of how troubled we have to be about the jury's finding? Well, reasonable probability, and I think this court has sometimes used the term that it's reasonably likely that it would affect the outcome of the proceeding. In other words, that had the jury instruction been given, it would be reasonably probable that Mr. Stevens would have been acquitted. And our position is that there's absolutely no, that there really is no possibility that this instruction would have aided his defense.  I mean, the way Mr. Stevens decided to participate in what he knew wasn't, well, he participated in a robbery. He assisted Mr. Quinn in stealing the money. There's no question that his presence, his armed presence in the store, he went back into that store armed with a gun after he had stood in front of the counter while Quinn was behind the counter. This is during the initial phase of the robbery, pushing and screaming at the clerk to give him money. Then he stays behind and he says to the clerk, how dare you, you know, pick up that gun and handle that gun and pull that gun on my cousin. There's clearly a relationship there. Then he leaves the store, Quinn comes back in, Stevens comes back in about 15 seconds later armed with his gun. Smith comes in right before Stevens armed with a gun. So we, the, I'm spilling over into the Pinkerton argument a little, but there's clearly concerted action here. There is some sort of discussion about going back in to that store or understanding the other two are going to help Quinn get his money. And Stevens in particular knew about Quinn's intent to get money from the store and steal money. This wasn't, you know, an attempt to just be paid back for something. He was aware of the situation. As to the gun, Stevens, by pointing, as Smith is pushing the clerk back along the counter and Quinn, with Quinn right behind him, grab it, pointing at his pocket, saying, here's the store gun, that at that point Stevens pulls out his gun and points it right at the clerk. And he really, he doesn't leave the store. During the actual robbery of the cash, he's standing up near the front of the counter. He could have left. He could have left if his defensive trial was, I'm the fixer. I went in there to try and stop this dispute over money. I was really just trying to keep the peace, make sure things didn't escalate. That was his entire defense. His argument was, I did not participate in the robbery. I had no intention to take any property from that store or to help the others take property. I really wanted things to just calm down and deescalate and be there. And that was his, that was really his closing argument. It's not that long, but that was the gist of his argument. So is it the jury accepted his argument? Then they would have acquitted him based on the instruction that was given. Because he said, I wasn't involved in this robbery. He didn't say, I helped them, but I'm going to, you know, I'm not guilty because I really didn't have an intent to keep the property. But wasn't the difference that the instruction that was given was an intent of knowingly and willfully? It's a general intent instruction. And you're, you seem to be saying on the one hand that specific intent is an element of the offense, and on the other hand that not giving it the intent of, a specific intent to deprive, is somehow implicit in a general intent instruction. How could that be? When I say that the instruction incorporates that, I wasn't necessarily talking about the general intent requirement of the instruction. I was saying the actual definition of robbery that was given to the jury, which requires the unlawful taking of property from another person by force, implicitly includes the element of an attempt to permanently keep that property. So there's two intent requirements in the statute? The way it has, yes. There's a, well, the knowing and willful conduct also applies to the actus reus of the offense, the forcible taking itself. And then the question is, is there another specific intent requirement that applies to what you do with the property you just forcibly took from the other person? And that's why Nedley is just, it's just, it is wrong in that sense, because it makes no sense. And as Judge Ambrose pointed out, there's Pinkerton liability. And Pinkerton liability doesn't require specific intent. It requires foreseeability. And I believe Judge Bevis, I don't have the cases at the top of my head, but you noted that in the recent safe house decision when you were talking about, you know, a robbery where then there's a shooting, and it's under Pinkerton liability. You don't have to, even a murder, you don't have to have the specific intent to commit the murder. It's enough that it was foreseeable that your co-conspirator was going to go do that. So we can get around this whole problem with Pinkerton liability for sure. But we're also, we feel very strongly that there's no plain error here. And even if there was, there's no prejudice under the reasonable probability standard. If we were in harmless error territory, it might be different. It might be a different result. But we're not. We are here on plain error. Any further questions? Did you want me to address any of the sufficiency arguments? No. Okay. Thank you, Your Honor. Thank you very much. Go ahead. Thank you again. So briefly, I'm not sure how the instruction that was given can effectively encompass a specific intent standard. I don't know how a jury would infer that the word knowingly takes a gun means all the common law elements. It says knowingly and willfully buy robbery. So we would have to have the jury infer that the word robbery incorporates the common law elements of robbery. Then the jury would have to know what the common law elements of robbery are and conclude they apply, even though the 11th Circuit said they didn't. I don't think the jury are somehow going to infer what those elements are, that they somehow are going to know that you have to have a specific intent to permanently deprive someone of property. Literally taking something is different than then, you know, going home with it, versus disarming someone during a fight. Those are not the same thing. There's no way the jury is going to figure out that those are the same thing. And jurists, appellate jurists, disagree about what that means. So I don't see how it could possibly be effectively encompassed within it. And then so the government argued that this would upset thousands of cases. I don't think it would. The reason this is the first time this is coming up is so few robberies would ever present this defense, that it just is not a serious issue. We cited a 9th Circuit case that found that there was no, it wasn't a serious issue in that case, and so found the error was not plain. I don't think there's a risk of hundreds of convictions being overturned on this basis, because this is almost never going to be a real issue in any actual case. It's only an issue in this case because of the exceptional facts for my client specifically. And we've heard a lot of delving into the facts from the government and questions from the panel. I think all of those questions and all this disagreement about the evidence shows us that there was a real issue in this case of what's going on here. If we have to debate these questions, what did it mean when the witness said this? What did it mean when we saw this on a video? Those are questions that a jury should have answered. They should go to the jury with a proper instruction so it can make the correct decision of whether my client actually committed any offense in this case. And that's what didn't happen here. That is what should happen. The government also suggested that we were simply repeating the same argument that we made at trial, and in some sense that's true. The problem here is the jury didn't have the right instruction. The jury should have convicted my client under the erroneous instruction that the district court gave, because my client did assist in the taking of the gun, literally grabbing it from the store clerk. I don't see how you don't convict with that instruction. The real issue in this case was did he intend to take it? Was he a real participant in the robbery in the sense that he wanted to take this property from the store? And that was the defense trial counsel tried to present and couldn't and had to sort of dance around it at his closing, because there wasn't a legal peg to hook this argument into, and the jury didn't know that it was a real argument, and they rejected it and they probably should have rejected it. So that is why we needed this instruction and why it matters that we did not get it. What about aiding and abetting not with taking the gun but the $100? So, again, I think the intent issue is the same, is that you have to show that my client intended to permanently deprive the store of the $100. Our point is that the evidence of record shows that my client was not trying to take the store's $100 and lack the intent necessary. Even if you say factually his conduct contributed to it, the question is what his intent was. So you have not only the statements of the government's witnesses, the video, the criticism of the people who were taking it, and I think the evidence of record shows that the jury properly could find that my client had no desire to deprive the store of the $100. All you need do is believe his own statements to that effect. And there's no reason the jury can't credit my client's statements that he intended to return the $100 to the store. So that alone would support a jury finding. There would certainly be sufficient evidence, and there's additional evidence from all the other sources in the record that my client didn't want to accomplish the goals of the plot of his co-defendants. And while you could dispute it, again, that's a question that a jury should decide, and it didn't and it should. And so we ask for a remand to the trial court for a new trial. Thank you both, all counsel actually, for well-presented arguments. There was an opportunity to file some supplemental briefing. Judge Bevis, what would the question be that you would like to have? I think Judge Cross was getting at the impact, if any, of Carter v. United States 530 U.S. 255 at 261 to 67 on the continued validity of Nedley and the elements of Hobbs Act robbery. What was the citation again? I'm sorry. Carter v. United States 530 U.S. 255 at 261 through 267. Thank you, John. And I would suggest no more than five double-spaced pages by the end of next week's Thanksgiving week, so let's say by 4 p.m. on Tuesday the 22nd. 22nd. Understood, John. Thank you. Unless you want to do Thursday, but I don't think you really want to do that, do you? I've got enough to do. Let's just get it done by 4 p.m. on Tuesday the 22nd. Thank you very much. Thank you, everyone.